GREENBERG TRAURIG, LLP
David D. Cleary, AZ SBN 011826
clearyd@gtlaw.com
2375 East Camelback Road, Suite 700
Phoenix, Arizona 85016
Telephone: 602-445-8000
Facsimile: 602-445-8100

COHEN KENNEDY DOWD & QUIGLEY, P.C.
Daniel Dowd, AZ SBN 012115
ddowd@ckdqlaw.com
Daniel Durchslag, AZ SBN 017213
ddurchslag@ckdqlaw.com
2425 East Camelback Road, Suite 1100
Phoenix, Arizona 85016
Telephone: 602-252-8400
Facsimile: 602-252-5339

*Attorneys for 10K, L.L.C.*

**IN THE UNITED STATES BANKRUPTCY COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| In re: | No. 2:12-bk-10598-RTB |
| WVSV HOLDINGS, LLC, | Chapter 11 |
| Debtor. | **OBJECTION OF 10K, L.L.C. TO DISCLOSURE STATEMENT CONCERNING DEBTOR'S PLAN OF REORGANIZATION** |
| | Hearing: |
| | Date: October 16, 2012<br>Time: 10:00 a.m.<br>Place: 230 N. First Avenue<br>Courtroom: 703<br>Phoenix, Arizona 85003 |

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

Creditor 10K, L.L.C. ("10K") hereby submits its objection (the "Objection") to the *Disclosure Statement Concerning Debtor's Plan of Reorganization* [Docket No. 87] (the "Disclosure Statement") filed by WVSV Holdings, L.L.C. ("WVSV"), debtor and debtor in possession in the above-captioned chapter 11 case. The Disclosure Statement should not be approved because it does not contain "adequate information," as required by the Bankruptcy Code, and because the *Debtor's Plan of Reorganization under Chapter 11 of the Bankruptcy Code* [Docket No. 86] (the "Plan")[1] is unconfirmable on its face. In support of the Objection, 10K respectfully submits the following memorandum of points and authorities:

## **MEMORANDUM OF POINTS AND AUTHORITIES**

### **I. PRELIMINARY STATEMENT**

WVSV's case is the quintessential two-party dispute as discussed at length in 10K's *Motion to Dismiss Debtor's Chapter 11 Case for Cause Pursuant to Section 1112(b) of the Bankruptcy Code* [Docket No. 60]. That 10K's claims—and the fate of this case—will be resolved outside the Bankruptcy Court is not in dispute. WVSV voluntarily chose this path. The Court will recall that one of WVSV's first acts in this case was to seek relief from the automatic stay so that it could pursue its Petition for Review to the Arizona Supreme Court of an adverse ruling entered against it by the Arizona Court of Appeals. Considering WVSV filed bankruptcy solely for the purpose of shifting the balance of power in the state court litigation, WVSV has no intention of resolving 10K's claims prior to proposing a plan. Through its Plan, WVSV is attempting to transfer the property that is the subject of its litigation with 10K in the state court before that litigation concludes. The glaring and fundamental flaw in this strategy is that if 10K prevails in the state court—as it has before—the Plan **will** fail because WVSV will not be able to pay 10K's massive unsecured claim in full with interest as it proposes to do. The Plan's obvious lack of feasibility is only one of the many reasons why the Plan is unconfirmable on its face. The Plan is also unconfirmable because:

- It is not proposed in good faith as required by Section 1129(a)(3).

---

[1] Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Disclosure Statement and Plan.

-1-

- It separately classifies 10K's general unsecured claim from other general unsecured creditors with no stated or ostensible basis for doing so.

- The Plan does not provide adequate means for its implementation as required by Section 1123(a)(5).

Finally, the Disclosure Statement falls well short of providing "adequate information" to creditors and is misleading in many instances discussed below. Most critically, WVSV has failed to provide creditors with projections with respect to the sales of real property that would fund the payments under the Plan and has yet to file multiple exhibits to the Plan and Disclosure Statement. With the Plan unconfirmable and the information disclosed by WVSV inadequate, there is no basis for the Court to approve the Disclosure Statement.

## II. ARGUMENT

### A. The Disclosure Statement Describes a Plan That Is Patently Unconfirmable

Courts have long held that a disclosure statement may not be approved if the underlying plan of reorganization is unconfirmable on its face. See, e.g., In re Beyond.com Corp., 1289 B.R. 138, 140 (Bankr. N.D. Cal. 2003) ("Because the underlying plan is patently unconfirmable, the disclosure statement may not be approved."); In re Phoenix Petroleum Co., 278 B.R. 385, 394 (Bankr. E.D. Pa. 2001) (holding that if the described plan is fatally flawed so that confirmation would not be possible, it is appropriate to consider such issues at the disclosure hearing stage because "undertaking the burden and expense of plan distribution and vote solicitation is unwise and inappropriate if the proposed plan could never be legally confirmed"); In re Mkt. Square Inn, Inc., 163 B.R. 64, 68 (Bankr. W.D. Pa. 1994) ("Where it is clear that a plan of reorganization is not capable of confirmation, it is appropriate to refuse the approval of the disclosure statement."). The logic underpinning these cases is straightforward; it is not in the best interests of a debtor's estate to expend time and resources noticing and soliciting acceptances for a plan that can never be confirmed.[2] For the reasons discussed below, the Disclosure Statement should not be approved because the Plan, in its current form, is not confirmable.

---

[2] As concisely explained by one court:

If the disclosure statement describes a plan that is so fatally flawed that confirmation is impossible, the court should exercise its discretion to refuse to consider the adequacy of disclosures. Such an exercise of discretion is appropriate because undertaking the burden and

-2-

PHX 330,489,308v6

LAW OFFICES
GREENBERG TRAURIG
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

1. The Plan is not Proposed in Good Faith under Section 1129(a)(3)

Many courts have recognized that a plan is only proposed in "good faith" when it is consistent with policy goals grounding the Bankruptcy Code. See, e.g., United States v. Arnold & Baker Farms (In re Arnold & Baker Farms), 177 B.R. 648, 658 (B.A.P. 9th Cir. 1994) ("The good faith that is required to confirm a plan requires the plan to achieve a result consistent with the objectives and purposes of the Bankruptcy Code."), aff'd, 84 F.3d 1415 (9th Cir. 1996). The purpose of chapter 11 is not to allow enterprises with no reasonable prospect of rehabilitation to become mired in a downward spiral of continual losses. Rather, chapter 11 is intended to provide a locus in which latent value can be preserved for the benefit of all parties in interest. See, e.g., Canadian Pac. Forest Prods. Ltd. v. J.D. Irving, Ltd. (In re Gibson Group, Inc.), 66 F.3d 1436, 1442 (6th Cir. 1995) ("The purpose of [chapter 11] is to provide a debtor with legal protection in order to give it the opportunity to reorganize, and thereby to provide creditors with going-concern value rather than the possibility of a more meager satisfaction through liquidation."); In re Bonner Mall P'ship, 2 F. 3d 899, 916 (9th Cir. 1993) (noting how "the Supreme Court has made clear that successful debtor reorganization and maximization of the value of the estate are the primary purposes" of chapter 11).

Beyond its use of chapter 11 in order to leverage 10K in the state court, WVSV has not proffered any fact-based, objective basis to show that it can generate enough money to pay 10K's unsecured claim in full with interest. As such, confirmation of the Plan would be inconsistent with the purposes of the Bankruptcy Code.

2. The Plan Contains an Improper Classification Scheme

10K's claims against WVSV are divided into three separate classes: "10K, LLC Judgment Claim" in Class 2, "10K, LLC Secured Claim" in Class 4, and "10K, LLC Claim" in Class 6. While 10K's Class 2 and Class 4 claims may be unique and separate classification may be appropriate (which 10K does not concede), 10K's general unsecured claim in the approximate

---

expense of plan distribution and vote solicitation is unwise and inappropriate if the proposed plan could never legally be confirmed.

In re E. Me. Elec. Coop., Inc., 125 B.R. 329, 333 (Bankr. D. Me. 1991) (citations and quotations omitted).

-3-

PHX 330,489,308v6

LAW OFFICES
GREENBERG TRAURIG
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

amount of $417 million (Class 6) is substantially similar to WVSV's other general unsecured creditors (Class 3) and should be classified together and paid *pari passu*.

Prevailing Ninth Circuit law rejects separate classification of similarly-situated claims. Barakat v. Life Ins. Co. of Va. (In re Barakat), 99 F.3d 1520, 1525-26 (9th Cir. 1996) (citing both Sections 506(a) and 1111(b)(2) and holding that the secured lender's deficiency claim must be classified with similarly situated general unsecured claims; the only reason the debtor separately classified the deficiency claim was to "obtain acceptance of the Plan."); In re Tommies Northridge, Inc., 2010 WL 2723717, *1 (Bankr. C.D. Ca. May 14, 2010) ("A debtor may not classify similar unsecured debt differently solely to manipulate class voting."). This "one clear rule" was most memorably stated by the Court of Appeals for the Fifth Circuit as: "thou shalt not classify similar claims differently in order to gerrymander an affirmative vote on a reorganization plan." In re Greystone III Joint Venture, 995 F.2d 1274, 1279 (5th Cir. 1991).

The Plan contains three impaired classes that are entitled to vote on the plan: Class 3-General Unsecured Claims, Class 5-Pacific Coach/Spurlock Members' Claim, and Class 6-10K Claim. Plan, p. 7-8. For the Plan to be confirmed over the objection of an impaired class of creditors, at least one impaired class of claims must vote to approve the Plan. 11 U.S.C. § 1129(a)(10) ("If a class of claims is impaired under the plan, at least one class of claims that is impaired under the plan has accepted the plan[.]"). WVSV provides no explanation for its separate classification of 10K's general unsecured claim from the remainder of the general unsecured claims. Undeniably, if 10K's general unsecured claim of not less than $417 million were classified into Class 3 with similarly-situated general unsecured creditors, 10K would control the class and cause the class to vote against the Plan. This would leave WVSV's hopes of confirmation in the hands of a single class—Class 5. Yet, for the reasons discussed below, it is unclear how the creditors in Class 5 are direct creditors of WVSV entitled to vote on confirmation of the Plan.

-4-

### 3. The Plan Violates Sections 1123(a)(5) & 1129(a)(11) by Relying on Speculative Sales and Indeterminate Funding

Section 1129(a)(11) of the Bankruptcy Code embodies the "feasibility" test, which requires that confirmation of a proposed plan not be "likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor. . . ." 11 U.S.C. 1129(a)(11). To demonstrate feasibility, a Debtor must provide specific details and evidence to prove a sufficient likelihood that projections and contingencies (such as future sales of a secured creditor's collateral) upon which its plan is based will occur. As explained in Crestar Bank v. Walker (In re Walker):

> Other courts have found that plans of reorganization which fail to provide specific details for the sale of real estate, (including the date by which the sale must occur) or to identify the potential purchaser and the expected price do not satisfy the adequate means of implementation requirement of the Code thereby precluding confirmation. These decisions spell out a principle which is of vital significance to the credibility of reorganization under Chapter 11: **The debtor must offer more than speculation about the source of funding for the plan. The authorities teach that it is important for a plan of reorganization to make reasonably specific provisions for an adequate means of implementation because speculative, indefinite plans will necessitate objections by the creditors who have no reasonable means by which to assess whether a plan can achieve the results contemplated by the Code, and because the courts will have no objective criteria by which to make confirmation judgments.** . . .
>
> \*-\*-\*-\*-\*
>
> The Amended Plan, even as conditioned, provides no basis upon which to conclude that it is feasible within the meaning of 11 U.S.C. § 1129(a)(11). Without knowing the terms of the proposed sales of [certain] property, and without knowing the specific timeframe for the proposed sale, and without articulation of a schedule and a plan for the liquidation of other properties in the event that the sale of the [certain] property fails to yield sufficient funding, **it is impossible** for a court to find that there will be no need for further financial reorganization or indeed liquidation of the Bankruptcy Estate.

165 B.R. 994, 1003-05 (E.D. Va. 1994) (emphasis added; citations and quotations omitted). The In re Walker Court's detailed account of a facially inadequate plan describes WVSV's Plan rather well.

-5-

*PHX 330,489,308v6*

The Plan states that it will be funded by "(1) . . . cash on hand of the Debtor; (2) proceeds from the sale of any portions(s) of Tract A; (3) proceeds of any subsequent sale(s) of the Real Property; (4) the DIP Loan; and (5) infusion(s) of equity, to the extent necessary."[3] Plan, Section 8.1. However, each of these components of plan funding is problematic:

- WVSV has a mere $382.98 of cash on hand as of August 31, 2012. See Monthly Operating Report for August 2012 [Docket No. 90].

- The sale of Tract A will generate only $8.5 million in net proceeds to the Debtor.[4]

- There are no projections of the value that might be obtained from the sale of Tract B and Tract C, assuming WVSV ever obtains the right to sell them.

- To date, no "DIP Loan" has been approved by the Court, and, to the extent any DIP Loan is approved by the Court, it would, by definition, be required to be repaid on the effective date of the Plan. Further, WVSV's recent *Motion for Order Authorizing Post-Petition Secured Financing Pursuant to Bankruptcy Code § 364(c)(3)* [Docket No. 88] (the "Second DIP Motion") requests $500,000 of debtor-in-possession financing "to fund administrative expenses for legal fees incurred in these proceedings." Second DIP Motion, page 2, lines 24-25.

- WVSV has not identified the amount of any equity funding secured, the persons or entities that would provide equity funding or any evidence of such person or entity's financial wherewithal to do so.

To date, WVSV has only provided evidence supporting a sale of 800 acres of Tract A to AGS, LLC for $8.5 million. See Disclosure Statement, Exhibit 5. This $8.5 million is a mere 2% of 10K's $417 million unsecured claim. Aside from this, WVSV would have to use these funds to make ongoing payments under Junior Trust. Other than the $8.5 million from AGS, LLC, WVSV has failed to show through projections or otherwise, that it will be able to realize enough

---

[3] As noted in section B.1., *infra*, this is inconsistent with the Disclosure Statement which states that the Debtor will fund the plan by "sell[ing] the Real Property pursuant to either (1) 11 U.S.C. § 363, or (2) in the normal course of the Reorganized [D]ebtor's business post-confirmation." Disclosure Statement, page 7, lines 20-21.

[4] 10K also has a constructive trust claim (or to rescind WVSV's purchase) that the Court of Appeals recognized to have continuing vitality and such claim will ultimately be adjudicated by the state court. To the extent 10K is held to have a constructive trust claim, the proceeds of the sale of Tract A would be the subject of the constructive trust. Further, although the Purchase and Option Agreement by and between the Debtor and AGS, LLC, attached to the Disclosure Statement as Exhibit 5, purports to sell 800 acres of Tract A for $9.6 million (with an option granted to the buyer for an additional 516 acres), once sale costs are incorporated, the Debtor has stated it expects the net recovery to the estate will be $8.5 million.

funds from the sale of its assets (whether real or beneficial) to repay its creditors as proposed in the Plan.

The Plan's lack of feasibility is most aptly demonstrated in its treatment of 10K's massive $417 million unsecured claim against WVSV. The treatment proposed by WVSV is to first seek to challenge the claim through continued litigation and appeals,[5] and, when appeals are exhausted, to pay 10K in semi-annual payments of $340,000 ($680,000 yearly) until the earlier of (1) payment in full to 10K, or (2) fifteen years, upon which the remaining balance will become due and payable. Thus, feasibility hinges on WVSV's ability to challenge 10K's judgment against WVSV since, absent success, WVSV would be required to make $680,000 in payments per year to 10K with a balloon payment owing in year fifteen in an amount not less than $407,800,000, exclusive of interest.[6] In other words, a subsequent bankruptcy case is inevitable. Moreover, the Disclosure Statement contains no projections, let alone projections that would support the conclusion that WVSV could afford to make yearly payments of $680,000, much less a balloon payment in excess of $400 million.

### B. The Disclosure Statement Fails To Provide "Adequate Information" as Required by the Bankruptcy Code and is Misleading

The standard for approval of the Disclosure Statement and the caselaw interpreting and applying the same, are well known to the Court and need not be repeated at length herein. See In re New Power Co., 438 F.3d 1113, 1117-18 (11th Cir. 2006) (every holder of a claim must "receive a court-approved written disclosure statement containing 'adequate information' about a proposed plan before its vote on that plan may be solicited. . . . [which means] 'information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, that would enable a hypothetical reasonable investor typical of holders of claims or interests of the relevant class to make an informed judgment about the plan.'") (citing 11 U.S.C. §§ 1125(a)(1); 1126(b)(2)). The

---

[5] The Plan and Disclosure Statement are devoid of the bases for such appeals and challenges to 10K's claim.

[6] The Plan proposes that 10K's claim would accrue interest at the federal judgment rate. Disclosure Statement, p. 6, line 13.

-7-

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

lack of information, and the misleading nature of the information provided, in the Disclosure Statement precludes a finding of adequacy to invoke the cost and expense, and imposition of judicial resources, occasioned by the solicitation and confirmation process.

1. Plan Implementation is Contingent Upon the
Debtor's Ability to Prevail in its Litigation with 10K

The Plan will be funded by WVSV's sale of certain real property that WVSV purports to own. Thus, the Disclosure Statement states that the "Debtor will sell the Real Property pursuant to either (1) 11 U.S.C. § 363, or (2) in the normal course of the Reorganized [D]ebtor's business post-confirmation."[7] Disclosure Statement, p. 7, lines 20-21. WVSV purports to own Tract A in fee and purports to hold a beneficial interest in Tract B and Tract C, however, as discussed above, the proceeds of any sale of a portion or all of Tract A are likely subject to a constructive trust in favor of 10K and will not produce any proceeds that may be distributed to creditors. While WVSV proposes to sell 800 acres of Tract A to AGS, LLC which will generate net proceeds of $8.5 million, this amount is simply not close to enough to enough to pay WVSV's creditors and is merely a small fraction (2%) of 10K's $417 million unsecured claim. In addition, WVSV has failed to provide any projections or estimations, much less admissible evidence, as to the amounts that its expects to receive for Tract B and Tract C assuming it has the ability to sell such property.

2. The Disclosure Statement Misrepresents 10K's Interest in the Property

The Disclosure Statement is vague and ambiguous as to how 10K's secured claim pursuant to the Deed of Trust, which is currently in place on Tract A and secures 10K's interest, will be treated under the Plan. 10K is the beneficiary of a Deed of Trust that currently encumbers Tract A (the released portion of the Sun Valley Property) and that secures 10K's entitlement to 20% of the "profit" from the sale or other disposition of the entire Sun Valley Property.[8] The

---

[7] As described in section B.4., *infra*, this description is inconsistent with the Plan. See Plan, Section 8.1 (The Plan will be funded by "(1) . . . cash on hand of the Debtor; (2) proceeds from the sale of any portions(s) of Tract A; (3) proceeds of any subsequent sale(s) of the Real Property; (4) the DIP Loan; and (5) infusion(s) of equity, to the extent necessary.").

[8] The Junior Trust provides that a Deed of Trust shall be executed and recorded by First American Title Company, the trustee, against each phase immediately before a phase of the 10K Property is conveyed to Debtor.

-8-

Disclosure Statement is vague and ambiguous as to how 10K's secured claim pursuant to the Deed of Trust (which, again, is currently in place on Tract A and securing 10K's interest) will be treated under the Plan. The Disclosure Statement does not clearly state that 10K's profit participation and Deed of Trust will continue to encumber all property released from the Senior Trust and Junior Trust, as mandated by the governing documents, which clearly establish that 10K is entitled to its profit participation on the entire 13,260 acres.

As the Disclosure Statement states, the underlying transactions, whereby WVSV claims it acquired the 13,260 acres of the Sun Valley Property at issue, were structured utilizing two subdivision trust agreements, the Senior Trust and the Junior Trust. WVSV is not a party to the Senior Trust. Instead, 10K acquired interest in the 13,260 acres, essentially 10,000 acres that it already owned and approximately 3,260 acres that it acquired and then transferred to the Trust) and then transferred the property to WVSV. It is undisputed that 10K is entitled to 20% of the "profit" as that term is defined in the Junior Trust, from the sale or disposition of the entire 13,260 acres of the Sun Valley Property, as defined in this bankruptcy by WVSV as Tract A, Tract B and Tract C.

The Junior Trust states that WVSV shall pay to 10K in lieu of interest, an amount equal to 20% of the Profit from the 10K Property. The Junior Trust, and the parties' consistent actions throughout their relationship, establishes that this profit participation applies to what WVSV defines as Tract A, Tract B and Tract C. For example, the Junior Trust states that the purchase price for the "10K Property" is $66,300,000.00. And, the Junior Trust later states "The Purchase Price has been calculated by multiplying $5,000 per acre by 13,260 acres, which is the total number of acres that comprise the 10K Real Property." By extension, therefore, the Junior Trust defines the 10K Property as the 13,260 acres and it is undisputed that WVSV will have "paid" $66,300,000.00 for the entire 13,260 acres of 10K Property. Section II(E) of the Junior Trust, in referencing the master planning of the property, states that the "Master Plan shall not include a condition or undertaking that the 10K Property (**which includes the Spurlock Property**) be developed as part of the overall development plan of other real property that is not part of the 10K Property." (Emphasis added).

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

Moreover, WVSV has always acted in a manner consistent with this definition of the 10K Property and treatment of 10K's profit participation interest as applying to Tract A, Tract B and Tract C. For example, 10K's Deed of Trust currently encumbers Tract A, which is composed entirely of property formerly owned by the Spurlocks (and acquired by 10K through the Senior Trust). And, WVSV previously relied on the language in Section III(A) of the Junior Trust, which entitles WVSV to possession of the 10K Property during the duration of Debtor's interest in the Junior Trust, and Section III(D) of the Junior Trust ("the trustee is authorized to dedicate any 10K Property . . . to public use, roads, alley or easements") to grant and obtain compensation for temporary easements placed on the portion of the 10K Property previously owned by the Spurlocks. The governing documents and WVSV's past conduct establish that 10K's profit participation applies to Tract A, Tract B and Tract C and this reality should be unambiguously stated in the Disclosure Statement. WVSV's argument concocted to exact an advantage in the Plan confirmation process is so lacking in merit and belied by WVSV's representations in the State Court over the last 10 years[9] that it undermines the credibility of WVSV's entire reorganization effort.

### 3. The Disclosure Statement Fails to Explain How the Parties in Class 5 Are Creditors Entitled to Vote on the Plan.

The parties listed in Class 5 hold their interests in the Property by virtue of their rights under the Senior Trust. The parties to the Senior Trust are: (i) First American Title Insurance Company, as Trustee, (ii) Calvin-Crockett Cattle Co. aka Calvin Crockett Cattle Company as a 39.3958% first beneficiary interest; (ii) David Spurlock & Sons General Partnership as a 35.0185% first beneficiary interest, (iii) Michael E. Tiffany, a 13.1319% first beneficiary interest, (iv) Spurlock Land Investors I Limited Partnership, a 4.8397% first beneficiary interest, and (v) Spurlock Land Investors II Limited Partnership, a 7.5141% first beneficiary interest, and (vi) 10K, the second beneficiary. WVSV is not a party or a signatory to the Senior Trust.

---

[9] In particular, the Debtor's characterization of 10K's interest in the Disclosure Statement is inconsistent with Conley Wolfswinkel's characterization at trial in the State Court. See, Exhibit 1 to Declaration of Daniel Dowd filed concurrently herewith.

-10-

*PHX 330,489,308v6*

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

The Disclosure Statement correctly states that the Senior Trust was created to facilitate seller "carry-back" financing. Disclosure Statement, p. 10, lines 6-7. However, the Disclosure Statement incorrectly states that the Senior Trust facilitated the financing of WVSV's purchase of the Sun Valley Property. In fact, the Senior Trust facilitated the financing of **10K's** purchase of the Spurlock portion of the Sun Valley Property. 10K is directly obligated to the first beneficiaries under the Senior Trust—not WVSV. WVSV is instead directly obligated to 10K under the Junior Trust. Because WVSV has no direct contractual relationship with any of the first beneficiaries under the Senior Trust, it is unclear why WVSV believes that the first beneficiaries have "claims" within the meaning of Section 101(5) against WVSV. Pursuant to the Senior Trust, the first beneficiaries could only have a "right to payment" from 10K under the Senior Trust. The fact that WVSV may have made certain payments contemplated by the Junior Trust directly to the first beneficiaries under the Senior Trust does not create a direct debtor/creditor relationship. Moreover, while WVSV's rights under the Junior Trust would be affected by a breach of 10K's obligations under the Senior Trust, that does not create a debtor/creditor relationship between WVSV and the first beneficiaries under the Senior Trust.

### 4. The Disclosure Statement Fails to Disclose the Means for Implementing the Plan, as Disclosed in the Plan

The "Means for Implementation" section of the Plan is inconsistent with the Disclosure Statement. As discussed above, the Disclosure Statement states that the "Debtor will sell the Real Property pursuant to either (1) 11 U.S.C. § 363, or (2) in the normal course of the Reorganized [D]ebtor's business post-confirmation." Disclosure Statement, p. 7, lines 20-21. However, the Plan states that the means for implementing the Plan are "(1) . . . cash on hand of the Debtor; (2) proceeds from the sale of any portions(s) of Tract A; (3) proceeds of any subsequent sale(s) of the Real Property; (4) the DIP Loan; and (5) infusion(s) of equity, to the extent necessary." Plan, Section 8.1. Yet, as discussed above, each of means for implementation is problematic and not fully described in the Disclosure Statement. At a minimum, the Disclosure Statement should disclose WVSV's current cash position, WVSV's attempts to secure debtor-in-possession funding and its requirement that it be repaid on the effective date, some description of the timing and

-11-

proceeds of any sales and the identity of any sources of equity. Without such detail, the Disclosure Statement is patently deficient and cannot be approved.

### 5. The "Risk Factors" Section of the Disclosure Statement is Incomplete and Without Substance

The section of the Disclosure Statement entitled "Risk Factors" is limited to the risks inherent in (1) fluctuations in the value of WVSV's assets due to general economic factors, and (2) non-confirmation of the plan. However, as discussed herein, WVSV's Plan is replete with risks that WVSV wholly ignores in the Disclosure Statement including, but not limited to:

- WVSV may not be able to modify the Senior Trust agreement, to which it is not a party.
- WVSV will never have sufficient resources to pay its obligations to 10K, specifically including the $680,000 per year it proposes to make to 10K on account of 10K's approximately $417 million class 6 general unsecured claim.
- WVSV may be unable to secure third-party financing to comply with its obligations under the Plan.

As these very real factors have the potential to dramatically affect WVSV's ability to consummate the transactions contemplated under the Plan, they should be disclosed and addressed in the Disclosure Statement.

### 6. The "Alternatives to the Plan" Section of the Disclosure Statement is Misleading

The "Alternatives to the Plan" section of the Disclosure Statement contemplates only one alternative: a chapter 7 liquidation under the control of a chapter 7 trustee. Even though a chapter 7 liquidation is not considerably different from WVSV's Plan—which contemplates selling Tract A in fee and selling WVSV's beneficial interests in Tract B and Tract C to pay creditors—WVSV casts it as an unfavorable alternative because the "trustee would be entitled to retain a new set of professionals, including lawyers and accountants[.]" Disclosure Statement, p. 25, lines 8-9. These new professionals, WVSV asserts, "would substantially increase professional fees and result in further delays and a reduction of distributions." Id. at p. 25, lines 11-12. Thus, the Disclosure Statement does not put forth legitimate alternatives to the Plan,

-12-

*PHX 330,489,308v6*

Case 2:12-bk-10598-MCW    Doc 102    Filed 10/10/12    Entered 10/10/12 16:11:29    Desc
Main Document    Page 13 of 17

instead attacking a liquidation based only on a de minimis increase in administrative fees. Further, while WVSV may not see a chapter 7 liquidation as a favorable outcome, without a liquidation analysis, WVSV's creditors are left to guess which scenario is in their best interests.

In addition, WVSV believes that a "sale is fraught with a multitude of issues, such as the lease of where WVSV currently conducts its operations, and the lease of a substantial amount of the [D]ebtor's equipment." Id. at p. 25, lines 5-7. WVSV's concern could not be more contrived. WVSV's Schedule G lists only a grazing lease and the Purchase and Option Agreement with AGS, LLC—there is no lease listed for any place of business or any equipment. No WVSV representative can truthfully stake (under the strictures of Rule 11) that the operating of WVSV or its manage as the Wolfswinkel family of entities are conducted on the Sun Valley Property. Furthermore, WVSV's schedules valued the Sun Valley Property it purportedly owns at approximately $120 million which makes any lease for a place of business and/or equipment de minimis in comparison.

7. The Disclosure Statement Fails to Disclose Significant Contingent Indemnity Obligations that are Preserved Unnecessarily under the Plan

Section 6.2 of the Plan provides that:

> [T]he obligations of the Debtor to defend, indemnify, reimburse, or limit the liability against any claims or obligations of their former directors, officers or employees who served as directors, officers and employees, respectively, on or after the Petition Date . . .shall survive confirmation of the Plan, remain unaffected thereby, and not be discharged, irrespective of whether indemnification, defense, reimbursement or limitation is owed in connection with an event occurring before, on or after the Petition Date.

Plan, section 6.2. However, the disclosure statement is silent as to what the "obligations" are or the basis under which they arise. Thus, the Reorganized Debtor will continue to indemnify WVSV's insiders **for pre-petition actions**. These retained indemnity obligations benefit only one group of people—WVSV's insiders—and do so with no corresponding benefit to WVSV and at the possible expense of WVSV's creditors. Considering nine years of litigation has transpired between 10K and WVSV, the indemnity obligations may have a serious financial cost to WVSV and, as such, the reason for retaining the obligations, the benefit to the estate for such retention,

-13-

and the possible financial implications such indemnity obligations must be disclosed in the Disclosure Statement—instead, they do not even receive a passing reference.

### 8. The Plan and Disclosure Statement are Missing a Liquidation Analysis and Projections

WVSV's liquidation analysis (identified in the Disclosure Statement as Exhibit 7) was not filed with the Disclosure Statement and, as of the date hereof, has not been filed with the Court. A disclosure statement must include an accurate detailed liquidation analysis so creditors can assess if a proposed reorganization plan provides recovery better than would result in a hypothetical chapter 7 liquidation. See In re Cohen, 173 B.R. 950, 954 (Bankr. S.D. Fla. 1994) (holding that a debtor's plan was not confirmable because it failed to provide a liquidation analysis). Here, not only was no liquidation analysis filed, but, as discussed above, the Disclosure Statement fails to accurately and substantively describe in the Disclosure Statement a creditor's hypothetical recovery in a chapter 7 liquidation.

More troubling than the fact that WVSV has yet to file its liquidation analysis is that no projections were filed whatsoever. A debtor's projections of future revenues and expenses are often the most critical information a creditor needs to evaluate a plan and feasibility. Projections must be provided in any disclosure statement and must offer sufficient information as to their preparation and the underlying assumptions, so that they can be intelligently analyzed. See In re Cardinal Congregate I, 121 B.R. 760, 767 (Bankr. S.D. Ohio 1990) ("the Disclosure Statement should clearly identify all assumptions made in calculating *pro forma* information and should set forth those facts supporting all estimates."); In re Ferretti, 128 B.R. 16, 21 (Bankr. D.N.H. 1991) (holding that the debtor's disclosure statement did not contain adequate disclosures where the debtor's disclosure statement stated that it is "virtually impossible to provide reasonable projections" but asserted that, based on the debtor's experience, the plan was feasible.); In re Adana Mortg. Bankers, Inc., 14 B.R. 29 (Bankr. N.D. Ga. 1981) ("The Disclosure Statement provides no financial information, data, valuations, or projections relevant to the determination by the creditors of whether to accept or reject WVSV's Plan. Such financial information is the nature of that required under Section 1125 to constitute 'adequate information.'"). Given that

-14-

WVSV's Plan implementation is based upon sales of Tract A and sales of beneficial interests on Tract B and Tract C, there should be a projected schedule of sales and marketing costs/efforts during the Plan duration with anticipated milestones measured against anticipated payments to creditors. Without such projections, there is simply no way to evaluate the feasibility of WVSV's Plan. By failing to provide either a liquidation analysis or projections, WVSV fails to provide its creditors with the adequate information necessary to vote on the Plan in an informed manner; as such, the Disclosure Statement should not be approved.

**III.  RESERVATION OF RIGHTS**

Nothing contained in this Objection is an admission or concession that WVSV and its estate have any legal or equitable interest in the Sun Valley Property (or any portion thereof) and 10K hereby reserves its right to challenge the same. 10K further reserves its rights to expand upon any of the arguments presented herein, or put forth new arguments, when it files its objection to the Plan, if necessary.

## IV. CONCLUSION

**WHEREFORE**, 10K respectfully requests that the Court determine that the Disclosure Statement (1) purports to solicit a Plan that is not confirmable on its face, and (2) does not contain "adequate information" as defined in section 1125 of the Bankruptcy Code and enter an order denying approval of the Disclosure Statement.

RESPECTFULLY SUBMITTED this 10th of October, 2012.

GREENBERG TRAURIG, LLP

By */s/ David D. Cleary*
David D. Cleary
*Attorneys for 10K L.L.C.*

E-FILED this 10th day of October 2012 with the Clerk of the Court.

COPIES of the foregoing were served electronically this 10th day of October 2012 via the Court's ECF system on all parties that have appeared in this case.

*/s Barrie Peagler*

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000